1 | Raymond D. McElfish, Esq., SBN: 224390
2 | Email: rmcelfish@mcelfishlaw.com
   | Jose C. Massó IV, Esq., SBN: 256426
3 | Email: jmassó@mcelfishlaw.com
4 | MCELFISH LAW FIRM
   | 1112 N. Sherbourne Drive
5 | West Hollywood, California  90069-2202
6 | TEL: (310) 659-4900/FAX: (310) 659-4926
   | Our File No: LA06-286
7 | Attorneys for Plaintiff, RAYMOND D. McELFISH
8 |

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND D. MCELFISH, an individual | ) CASE NO. **CV12-2945-DSF** (MRWx) |
| Plaintiff, | ) |
| vs. | ) **COMPLAINT** |
| | ) **1. UNLAWFUL BUSINESS PRACTICES – UNFAIR COMPETITION  LAW** (Bus. & Prof. Code §§17200, *et seq.*) |
| CHASE HOME FINANCE LLC and JP MORGAN CHASE, N.A. | ) **2. UNFAIR BUSINESS PRACTICES UNFAIR COMPETITION LAW** (Bus. & Prof. Code §§17200, *et seq.*) |
| Defendants. | ) **3. FRAUDULENT BUSINESS PRACTICES – UNFAIR COMPETITION LAW** (Bus. & Prof. Code §§17200, *et seq.*) |
| | ) **4. UNFAIR DEBT COLLECTION PRACTICES** (Cal. & Civ. Code §§1788, et seq.) |

1

COMPLAINT

)  **5. BREACH OF CONTRACT AND**
)  **BREACH OF THE DUTY OF GOOD**
)  **FAITH AND FAIR DEALING**
)  **(Direct Contracts)**
)
)  **6. BREACH OF CONTRACT AND**
)  **BREACH OF GOOD FAITH AND**
)  **FAIR DEALING**
)  **(Third Party Beneficiary)**
)
)  **7. PROMISSORY ESTOPPEL**
)
)  **8. UNJUST ENRICHMENT**

**9. TEMPORARY RESTRAINING ORDER/PERMANENT INJUNCTION**

**JURY TRIAL DEMANDED**

Plaintiff Raymond D. McElfish, alleges the following based upon information and belief, and upon the investigation of counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I.     JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action is between citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1367 in that it involves a federal question, as

1  Plaintiff is an intended third-party beneficiary to a contract between JPMorgan
2  Chase, N.A. and the United States through its Financial Agent.

3      3.      Venue is proper in this District under 28 U.S.C. §§ 1391(a), (b), and
4  (c). Chase Home Finance LLC and JPMorgan Chase Bank, N.A. do substantial
5  business in the State of California and within this Federal Judicial District,
6  receive substantial compensation and profits from the servicing of home
7  mortgage loans in this District, have made material omissions and
8  misrepresentations, breached contracts and/or other promises, and engaged in
9  unlawful practices in this District, so as to subject them to personal jurisdiction in
10 this District. Plaintiff resides in this District, and the property for which Chase
11 Home Finance LLC is the mortgage loan servicer is in this District.

12     4.      This Court has personal jurisdiction over the Defendants to this
13 action because Chase Home Finance LLC and JPMorgan Chase Bank, N.A. do
14 substantial business in the State of California.

15     5.      This Court has the power to grant equitable relief to plaintiff to
16 restrain defendant's from foreclosing on plaintiff's home and selling it at auction
17 on April 9, 2012 without a decision on modification and the power to enjoin
18 defendants until a lawful decision is made on the modification process or the
19 plaintiff is permitted to pursue other alternatives such as a short sale or
20 bankruptcy.

21
22                      II.    INTRODUCTION

23     6.      This action is brought by Plaintiff whose home mortgage loan was or
24 is serviced by Chase Home Finance LLC or JPMorgan Chase Bank, N.A. and
25 who (a) has attempted to obtain a permanent loan modification from Chase
26 Home Finance LLC or JPMorgan Chase Bank, N.A. through the Home
27 Affordable Modification Program ("HAMP") or similar loan modification programs;
28 and (b) have not been given a decision by Defendants on Plaintiff's application,

(c) have set a sale on plaintiff's home for April 9, 2012 to sell it at auction; (d) Defendants refuse to postpone the sale date until a decision is reached on plaintiff's application for a modification up until a day or so before the sale or not at all; (e) defendants and its agents refuse to put any of their decisions of intentions into writing and (f) plaintiff runs the risk of the home being auctioned by the defendants without any time to short sale the home, rent it, consider bankruptcy or to even move out of it and obtain another suitable place to live.

7. As set forth in more detail *infra,* Plaintiff brings common law and statutory claims for unlawful, unfair, and/or fraudulent business practices in violation of California Business & Professions Code, § 17200, *et seq.,* (California Unfair Competition Law ("UCL")); violation of the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"), Cal. Civ. Code § 1788.2(c); breach of contract; breach of the duty of good faith and fair dealing; promissory estoppel; and unjust enrichment and seeks a temporary restraining order against the sale of the property on April 9, 2012 and a permanent injunction against the sale of the home until this lawsuit is resolved.

8. Plaintiff has endured a breathtaking array of unfair, deceptive, and misleading practices and breaches imposed on him by Defendant Chase Home Finance LLC, its parent company Defendant JPMorgan Chase, N.A. and its foreclosure agent California Reconveyance Company[1] over the past two years, as he has tried to meet constantly shifting demands with respect to his attempts to obtain a mortgage loan modification. Chase has strung Plaintiff along, repeatedly requesting documentation that Plaintiff had already provided, and promising an illusory permanent loan modification or "workout solution" that Chase apparently never intended to grant. While leading Plaintiff on with the promise of a loan modification or other "permanent" solution, Chase continued to

---

[1] Hereinafter, Chase Home Finance LLC and JPMORGAN Chase Bank, N.A., will be collectively referred to as "Chase."

demand and accept plaintiff's many financial documents, under the false premise that these documents supported Plaintiff's efforts to obtain a modification, obtain an alternative permanent solution, and/or avoid active foreclosure proceedings. Had Plaintiff been aware that Chase never intended to modify his loan as promised, he would have short sold his home at the outset, forgoing the entire modification process or at least the opportunity to consider alternative options. Now Chase intends to foreclose on Plaintiff's home on April 9, 2012, without a decision on modification which has been promised for almost a year and without the opportunity to short sale the home and avoid foreclosure.

9.     Plaintiff's experience is unfortunately not unique. It is merely illustrative of Chase's standard practices, which have damaged not only Plaintiff, but an entire Class of California mortgagors in California. (*See Dianna Montez v. Chase,* U.S. District Court, Southern District of California). Plaintiff is but one of many mortgagors ensnared by Chase's systemic and intentional unlawful behavior.

10.     Among other things, Chase, in bad faith, instructs mortgagors to stop making mortgage payments under the false pretense that doing so will not hurt credit scores and is necessary for them to attain a loan modification; fails to grant promised permanent HAMP or non-HAMP loan modifications, fails to provide temporary modified payment plans; fails to take reasonable steps to work with eligible mortgagors to establish permanent HAMP or non-HAMP modifications; misrepresents the status of loan modification applications; repeatedly requests duplicative financial information; erects artificial obstacles in the evaluation process to obstruct, delay, and/or prevent permanent loan modifications; fails to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed; fails to keep accurate records of HAMP applicants' scores on standard Net Present Value ("NPV") tests; fails to provide account information requested by

mortgagors; fails to provide adequate explanations of fees charged to mortgagors; charges excessive, unlawful, and unreasonable fees; inexplicably and arbitrarily increases mortgagor debt obligations; fails to properly apply mortgagor payments in whole or in part; causes improper interest and other fees to accrue; breaches HAMP TPPs or other temporary modification agreements, and unlawfully proceeds with foreclosures based on mortgagors' failure to meet impossible and shifting demands.

### III.   PARTIES

11.   Plaintiff Raymond D. McElfish and his wife Lillian reside in Los Angeles, California. His home mortgage loan for the property located in California at 11718 Laurelwood Drive, Studio City, CA, 91604 and is held by Defendants. The Chase Loan Number for the servicing of Plaintiff's mortgage is 5304244733. The Trustee Sale Number is 253008CA.

12.   Defendant Chase Home Finance LLC is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors, including pooled mortgage-backed securities. Chase Home Finance LLC is a Delaware corporation, and is a wholly-owned subsidiary of JPMorgan Chase Bank, N.A.

13.   Defendant JPMorgan Chase Bank, N.A. is a national banking association with corporate headquarters located at 270 Park Avenue, New York, NY 10017. JPMorgan Chase Bank, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co. On information and belief, JPMorgan Chase Bank, N.A. directed, controlled, formulated, and/or participated in Defendant Chase Home Finance's loan servicing activities in California and is jointly and severally liable for Chase Home Finance's unlawful activity.

/ / /

/ / /

## IV.   FACTUAL BACKGROUND

### A.   Mortgage Loan Servicers Profit from Delayed Loan Modifications.

14.   Over the past several years, the United States housing market has been in crisis. A Congressional oversight panel in 2009 noted that one in eight U.S. mortgages was currently in foreclosure or default. Press Release, Congressional Oversight Panel (Oct. 9, 2009).[2] In 2010 alone, a record 2.9 million homes, or one out of every forty-five, received a foreclosure filing. And the forecast for 2011 is worse, with "lenders poised to take back more homes this year than any other since the U.S. housing meltdown began in 2006." Janna Herron, *Housing Woes Not Over for State, Nation,* Seattle Times, Jan. 14, 2011, at A13. Economists predict that interest rate resets on the riskiest of lending products—adjustable rate mortgages—will not peak until sometime in 2011. *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis,* Working Paper No. 573.2 at 9, fig. 30.[3]

15.   California has been severely impacted by this crisis. In 2010, "[m]ore than *half a million* California homes were involved in some stage of foreclosure," which, incredibly, was less than the "peak year" of the crisis in California, in 2009. Alejandro Lazo, *House Seizures by Banks Decline in State,* The Los Angeles Times, Jan. 13, 2011, at Al (emphasis added).

16.   Unlike early in the foreclosure crisis, when risky loans and a crashing housing market were driving the delinquency rate, today many homeowners are struggling to make their payments because of the weak economy. According to a senior vice president at RealtyTrac, a company that specializes in housing market research, "We've actually had a sea change in what's causing foreclosures, from the overheated home prices and bad loans to a second wave

---

[2] *Available at* http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited Jan 6, 2011).

[3] *Available at* http://papers.ssrn.com/sol3/papers.cmf?abstract_id=1458413 (citing study by Credit Suisse showing monthly mortgage rate resets).

**COMPLAINT**

1  of foreclosures actually caused by unemployment and economic displacement . .
2  . ." Alex Viega, *Foreclosure Activity Up Across Most US Metro Areas,* The
3  Associated Press, Jan. 27, 2011, Business News.

4      17.   Recently, all 50 state attorneys general and numerous federal
5  agencies have joined forces in an investigation into the foreclosure practices of
6  mortgage loan servicers like Chase. They are now pressing for a deal with the
7  nation's five largest banks—including Chase—to address governmental
8  concerns over servicing abuses. Nelson D. Schwartz & David Streitfeld,
9  *Mortgage Modification Overhaul Sought by States,* N.Y. Times, Mar. 4, 2011;
10 *see also* Nelson D. Schwartz, *Foreclosure Deal Near, State Officials Say,* N.Y.
11 Times, Mar. 7, 2011. Expressing the sentiment of the governmental entities
12 involved, the Attorney General of Arizona, for example, recently remarked:

13
14     What I'm most angry about is the simultaneous modifications
    and foreclosures. We need to look for a stipulated judgment in
15     all 50 states, that if someone is in modification, they can't be
    foreclosed.
16

17 Margaret Cronin Fisk, *Arizona Attorney General Seeks Changes to Home-Loan*
18 *Modification Process,* BLOOMBERG (Oct. 28, 2010 9:23 AM).[4]

19     18.   Against this backdrop, mortgage loan servicers have taken
20 advantage of struggling homeowners to boost their profits. Testimony before the
21 United States Senate Committee on Banking, Housing, & Urban Affairs outlines
22 the misleading and harmful business practices that abound in the mortgage
23 servicing industry. According to one expert, the "core problem" is "servicers'
24 failure to service loans, account for payments, limit fees to reasonable and
25 necessary ones, and provide loan modifications where appropriate and
26 necessary to restore loans to performing status." *Problems in Mortgage*
27

28 [4] *Available at* http://www.bloomberg.com/news/2010-10-28/arizona-attorney-general-seeks-changes-to-home-loan-modification-process.html.

COMPLAINT

*Servicing From Modification to Foreclosure: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs,* 111th Cong., at 3 (Nov. 16, 2010) (written testimony of Diane E. Thompson, National Consumer Law Center) [hereinafter Testimony of Diane E. Thompson].[5]

19.   In February of 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable ("MHA") program. In an effort to stem the foreclosure crisis, the HAMP was created by the U.S. Treasury Department, as part of the MHA. The HAMP "lowers [mortgagors'] monthly payment[s] to 31 percent of [their] verified monthly gross (pre-tax) income to make [their] payments more affordable."[6] While not the only vehicle for modifications, HAMP has been increasingly used by servicers since 2009.

20.   Yet, as a recently released ProPublica study makes clear, HAMP has been a failure in many ways, largely due to servicer abuses. Olga Pierce & Paul Kiel, ProPublica, *By the Numbers: A Revealing Look at the Mortgage Mod Meltdown,* Mar. 8, 2011 [hereinafter Pierce et al., *Meltdown*].[7] Indeed, the "average rate of [mortgage] modifications in the past two years is not significantly different than the rate before HAMP launched." *Id.* When HAMP was launched in April 2009, applicants waited many months for modifications    well beyond the three months contemplated under the program. *Id.* As of December 2010, two million homeowners have had their HAMP applications rejected: "1.3 million were denied even a trial modification and about 700,000 more had their trials cancelled." *Id.*

---

[5] *Available at* http://banking.senate.gov/public/index.cfm?FuseAction=Files. View&FileStore_id=c 1 fac0f6-5ac54ae5-85cc-e-2220255dfd9.
[6] Home Affordable Modification Program, http://www.makinghomeaffordable.gov/programs/lower-payments/Pages/hamp.aspx, (last visited Mar.3, 2011)
[7] *Available at* http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-the-mortgage-mod-meltdown#chances.

21.    Since HAMP's inception through November 2010, the number of trial modifications cancelled by participating servicers like Chase has vastly exceeded the number of conversions to permanent modifications. During this period, of the approximately 1.4 million trial modifications started, roughly 729,000 were cancelled and roughly 550,000 trials were converted to permanent modifications. Troubled Asset Relief Program: Status of Programs and Implementation of GAO Recommendations, Jan. 12, 2011, GAO-11-74, at 35.

22.    Central to the failure of HAMP and other loan modification programs are arbitrary roadblocks erected by servicers to prevent modifications from proceeding to completion. According to ProPublica, "[m]ore than half of [temporary payment plan] trials were canceled, most of the time *despite* the fact that the homeowner had made all of the payments." Pierce et al., *Meltdown* (emphasis added). And in nearly *one quarter* of modification rejections, servicers cited "missing" or "incomplete" documents as the reason for the denial. *Id.* (analyzing Treasury Department data). ProPublica estimates that almost half a million homeowners may have been rejected because of "lost" documents.

23.    Foremost among mortgage loan servicer abuses is their failure to provide eligible borrowers with permanent—whether HAMP or non-HAMP—loan modifications. Testimony of Diane E. Thompson at 3. Servicers often overstate restrictions imposed by the investors in mortgage-backed securities when denying modifications, thereby harming both the mortgagor and the investor, while the servicers increase their income. *Id.* at 8. Indeed, "modifications, short sales and deeds in lieu" are "generally better outcomes for both homeowners and investors" than foreclosures. Pierce et al., *Meltdown*.

24.    Servicers are increasingly offering what they prefer  temporary "repayment plans" instead of permanent modifications. Interminable repayment plans harm homeowners who are left with no finality, no permanent modification of loan terms, and no new underwriting. *Id.*

25. Operating under a "deny and delay" model, servicers give mortgagors the runaround, erecting endless barriers, stringing them along, forcing them to submit the same paperwork repeatedly, returning or refusing to accept payments, and otherwise thwarting mortgagors' sincere efforts to obtain permanent modifications. Testimony of Diane E. Thompson, at 9-13 (describing examples of how servicers drag out the mortgage modification process). The objective of these tactics is simple: profit. "During delay, fees and interest accrue." *Id.* at 11. Foreclosure-related fees racked up during protracted modification processes skyrocket servicer profits when they eventually foreclose, because servicers get to take the accrued fees including fees for property inspections, purported attorneys' fees and costs, and late fees, among others— off the top of the foreclosure proceeds before investors get their share. *Id.* at 19-36.

26. While a delayed foreclosure is often the result after a long modification application process, servicers strive for a "sweet spot" where they can stretch out a delinquency "without either a modification or a foreclosure," maximizing their fees. *Id.* at 21.

## B. Chase's Impact on Mortgagors is Significant.

27. Chase Home Finance LC is a loan servicer operated by JPMorgan Chase Bank, N.A. As of November 18, 2010, Chase was servicer for over nine million loans with a total value of $1.2 trillion. *Robo-Signing, Chain of Title, Loss Mitigation and Other Issues in Mortgage Servicing: Hearing Before the Subcomm. On Insurance, Housing, and Community Opportunity,* 111th Cong., Panel Two (Nov. 18, 2010) (written testimony of Stephanie Murdick, head of the "Office of Consumer Practices" at Chase).

/ / /

/ / /

28.   On information and belief, Chase has a significant servicing presence in California. Along with having retail bank locations throughout the state, Chase maintains sixteen "Homeownership Centers" throughout the state of California, where, according to Chase's website,"struggling customers can . . . meet face to face with loan advisors to talk about their situation."[8]

29.   Yet, Chase has modified less than a quarter of mortgages of "seriously delinquent" borrowers; the vast majority of the balance of such mortgages are "unresolved" with neither a modification nor a foreclosure. Pierce et al., *Meltdown* (analyzing Moody's data on 300,000 subprime loans more than three months behind, all of which currently sit in mortgage- backed securities). Indeed, Moody's data reveals that "[O]e *worst* [servicer] was JPMorgan Chase, where the average modification occurred 11 months after the borrower fell behind." *Id.* (emphasis added).

30.   Chase and its affiliates have denied modifications, cancelled modification trial periods, and left mortgagors in limbo at a rate of approximately *57%* according to Treasury Department data. And this alarming statistic does not even account for situations where Chase has not reported application response data. *Id.*

**C.   Chase Intentionally Misleads Borrowers by Stating that it Will Evaluate Borrowers for Eligibility and Offer Permanent Modifications to Qualifying Borrowers, Without the Intent to Do So.**

31.   On information and belief, Chase sends variations of the same form contracts to each borrower that seeks a loan modification. The agreements typically promise the borrower that if: (1) his/her representations about his/her financial state continue be true, and (2) he/she complies with the terms of the

---

[8] *See* https://www.chase.com/chf/mortgage/hrm_centers.

COMPLAINT

1   temporary payment plan, (if one is even offered, which in this case was not
2   offered to Plaintiff) and (3) he/she provides all required documentations, and (4)
3   the Lender determines he/she qualifies, then "the Lender will send [him/her] a
4   Modification Agreement. . . for. . . signature which will modify [his/her] Loan
5   Documents as necessary to reflect this new payment amount and waive any
6   unpaid late charges accrued to date, leaving no doubt that Chase is promising to
7   evaluate the borrower's application pursuant to HAMP guidelines. Chase also
8   utilizes non-HAMP temporary payment agreements with similar terms that
9   indicate that evaluation for a "permanent workout solution" will occur if the
10  mortgagor submits the required documentation.

11      32.    On information and belief, Chase sends the same form cover letters
12  to every borrower receiving a HAMP TPP. The "Trial Period Cover Letter" states
13  in its first paragraph that "If you qualify under the federal government's Home
14  Affordable Modification Program and comply with the terms of the Trial Period
15  Plan, we *will modify your mortgage loan and you can avoid foreclosure.*" See Ex.
16  5 (emphasis added). In other instances, Chase makes repeated assurances,
17  both in writing and verbally, that "permanent" modifications or "workout
18  solutions" will be forthcoming and that foreclosure will not proceed. Because
19  Chase fails not only to comply with the terms of its contract with the federal
20  government under HAMP, but also fails to make a good faith effort at compliance
21  with its own promises to borrowers, Chase intentionally misleads borrowers who
22  rely on Chase's promises when they sign TPPs or other agreements, and then
23  comply with the terms thereof, perform under the contracts, and provide valuable
24  consideration to Chase for which Plaintiff received nothing in return except
25  harassment, frustration, requests for more documentation, and requests for
26  more payments.
27  / / /
28  / / /

COMPLAINT

**D.     Plaintiff's Attempts to Secure Permanent Loan Modification Were Repeatedly Thwarted by Chase's Misleading Practices.**

33.     Plaintiff Raymond D. McElfish and his wife have lived in their home in Los Angeles since 2005.  On February 16, 2007 Mortgageit, Inc. extended an Adjustable Rate Note to Raymond McElfish for $1,000,000.00 with a maximum limit of $115.000% of the principal amount owed. Interest rate of 2.0% yearly.

34.     The Mortgageit, Inc. loan interest rate may change on first day of June 2007 based on the Index and the first of every month thereafter.  Monthly payments began on 1st day of April 2007 in the amount of $3,028.26 to be paid to GMAC Mortgage LLC, PO Box 780, Waterloo, IA   50704-0780.   GMAC Account Number 0713262863.   On May 1, 2007 Washington Mutual became responsible for all aspects of the loan previously with GMAC Mortgage LLC.

35.     In June 2007 the interest rate was adjusted from 2% to 8.875%. Thereafter the interest rates varied monthly at rates ranging from 4.375% to 8.875%. In April 2008 the required note payment rose to $3,255.37, which also was the minimum due each month.  The payment required to fully amortize the loan was $7,402.74.   At this time the principal due rose from $1,000,000 to $1,046,853.29.

36.     In the fall of 2008, Washington Mutual was taken over by the Federal Deposit Insurance Corporation when it became apparent that it would not be able to meet its obligations, largely due to Washington Mutual's expansion of its high-risk subprime mortgage loan origination and securitization activities.  It was promptly resold to JPMorgan Chase & Co. As a result of this deal, the servicing rights of Ms. Montez's mortgage loan were acquired by JPMorgan Chase Bank, N.A.

/ / /

37.   In April 2009 after Chase took over the loan, the required note payment was adjusted to $3,499.52, which was also the minimum due each month.  The payment required to fully amortize the loan was $5,563.96.  At this time the principal balance rose to $1,080,333.54.  The November 2009 minimum monthly payment increased to $7,768.27.  Chase added $4,268.75 for required escrow payments to the required note payment.

38.   In April 2010 the required minimum payment increased to $8,030.73. The April 20101 required note payment increased to $3,761.98.  The required escrow payment was $4,268.75.  The total principal balance in April 2010 was $1,090,372.53.   In November 2010 the required escrow payment became $1,037.68, changing the minimum required payment to $4,799.66.  In April 2011 the minimum required note payment increased to $4,044.12.   The required escrow payment was $1,037.68.  The minimum monthly payment increased to $5,081.80.  At this adjustment the principal balance was $1,090,789.30.

39.   At this point, the interest rates continued to climb, the principle continued to grow and the loan was in reverse amortization and the loan began to "recast". At this point, plaintiff contacted Chase in order to be considered for a loan modification and was informed that he needed to stop making payments in order to be eligible for a loan modification. The logic that was given by defendants was that if the borrower could make the payments and continued to do so that there would be no obvious need to modify.  At this point, plaintiff was undergoing various personal and professional hardships, needed to get the loan modified and stopped making payments as directed by defendants Chase.

40.   Plaintiff received notice from Chase that in April 2011 the monthly payment was scheduled to be recalculated without a payment adjustment cap, which could result in high new monthly payment based on deferred interest

added to the principal balance on your loan.  During 2008, plaintiff experienced a downturn in his business but continued making payments.  By April of 2011, plaintiff's business continued to decline and he could not longer handle the payments. At this time, plaintiff maintained very good credit and did not want to jeopardize his credit standing by falling behind on his mortgage payments. While he very much wanted to keep his long-time home, he recognized that if he would not be able to continue making payments at the current level, he may have to sell his house.

41.   While still current on his payments and hoping to avoid losing his home, Mr. McElfish phoned Chase to inquire about a loan modification in April 2011. He was instructed to complete an application and was told that he would be contacted by a "work-out specialist" purportedly someone who could guide him through the modification process within 21 days. Pursuant to this conversation, Mr. McElfish visited the Chase website and faxed his completed "Borrowers Assistance Form", along with several supporting documents including a hardship letter, two months bank statements, and four years of tax forms. Chase confirmed receipt of his fax.

42.   So began Mr. McElfish's one year ordeal trying to get a loan modification from Chase.  Between April 2011 and April 2012, Mr. McElfish was forced to restart the application process not several but many, many times. To this day, his request for a modification remains unresolved and the sale date is only several days away on April 9, 2012. The typical communication from Chase was that they needed additional documentation to qualify for a modification, but Chase assured Mr. McElfish it would be followed by a permanent loan modification. Chase assured Mr. McElfish that it would not take his house and that they are working with him, that they cannot postpone the sale date until a date or two before the auction date all while refusing to put any of their intentions

in writing.

43.    On information and belief the various related documents that Chase sent to Mr. McElfish for signature are standard forms—the terms of which were drafted entirely by Chase that Chase used and continues to use repeatedly with mortgagors such as Mr. McElfish.    Despite Chase's representations that compliance with its "plans" or agreements" would reduce Mr. McElfish's total arrearages, his compliance has apparently only increased them and allowed Chase to assess unrestrained fees to inflate his purported obligations, with no end in sight.

44.    As described more fully below, relying on Chase's repeated verbal representations that compliance with these plans would lead to a permanently modified loan, Mr. McElfish made every effort to meet Chase's ever evolving requirements, and sought clarification and/or adjustments from Chase when appropriate. During this time, Mr. McElfish received multiple verbal assurances from Chase representatives who told her that if he would continue on, send additional documentation, and generally cooperate, he would at last receive the modification he had been promised many months before. He has yet to receive that modification. The last communication from Chase was that the documents in the file are complete and the file is "coded" to be sent to "underwriting" and the sale date of April 9, 2012 will be postponed, so the modification process can continue. Chase nevertheless is actively pursuing foreclosure and a sale is scheduled in a matter of days, April 9, 2012.

45.    Chase has sent Mr. McElfish multiple default notices and started and pursued foreclosure proceedings against Mr. McElfish, scheduling a Trustee's Sale at least twice, with many more informal and unwritten—"postponements." The notices contain confusing information about the amount Mr. McElfish purportedly owes.

/ / /

COMPLAINT

## 1.   The Runaround

46.   In early April 2011, Mr. McElfish asked his financial planner Diane Wardrup to help him obtain a loan modification. Mr. McElfish and his financial planner called Chase together several times a week to ascertain the status of Mr. McElfish's mortgage and application for a modification. They had trouble obtaining any information because they were frequently placed on hold for long periods of time and only rarely were able to speak to the same Chase representative twice.

47.   In April of 2011, Mr. McElfish sent Chase additional documentation at Chase's request. Believing that he would receive a new payment amount on a modified basis, Mr. McElfish stopped his pending May mortgage payment and waited for instructions on his new payment amount.

48.   From April 11, 2011 to December 2011, plaintiff on his own attempted to keep up with the applications and requests from Chase to complete the modification, but got frustrated and hired his financial planner to help him. Copies of all of the letters, emails and faxes from Chase to Plaintiff and from plaintiff to Chase will be exchanged during discovery and are too voluminous to list in the complaint.

49.   But the more recent history is that on December 12, 2011, plaintiff again faxed the Complete Loan Application to Chase.  On December 29, 2011, Ms. Wardrup, plaintiff's retained financial planner, contacted Chase and talked to Chase file handler William Leggitt about the file in great detail.  Ms. Wardrup attempted to make sure William Leggitt understood the complicated situation with the 2nd lien charge offs, company paid debts reflecting on Mr. McElfish's personal credit report.  This conversation was 49 minutes long.

/ / /

/ / /

50.   On December 29, 2011, Ms. Wardrup called William Leggitt with Chase. Ms. Wardrup was unable to reach William Leggitt and left a voice message. Ms. Wardrup's voice message to William Leggitt was cut off so she attempted to call him back and left another message a second time. Ms. Wardrup called Mr. Leggit two more times with no returned phone call.

51.   On December 30, 2011, Ms. Wardrup called William Leggit six times to discuss the unique details of this file.  This call lasted 42 minutes.  On January 4, 2012, Diane Wardrup and William Leggitt talked about the borrowers corporations, what the borrower needed to prove the borrowers ownership of his corporation.

52.   On January 6, 2012, Diane Wardrup contacted William Leggitt to discuss the modification.  Chase file handler **William Leggitt informed Diane Wardrup that his department was being restructured due to EMC Mortgage and Chase merging and that he was not going to be the contact on the file soon and had no idea who would be assigned to the account.**

53.   On January 10, 2012, Diane Wardrup called William Leggitt again for a status and update on the modification file, no returned call.

54.   On January 11, 1012, Diane Wardrup contacted William Leggitt at Chase and informed him she had the Year to Date Updated P&L that he had insisted she send again.  Mr. Leggit informed Ms. Wardrup that he needed additional information that had already been sent and requested.  Diane Wardrup informed William Leggitt she would fax this letter to him as soon as she had it from Mr. McElfish. Diane Wardrup again faxed Mr. McElfish's tax returns and Updated P&L 3rd quarter to Chase that day.

55.   On January 11, 2012, William Leggitt talked with Mr. McElfish and explained the process of modification and informed Mr. McElfish that he needed the Tax Returns, Updated P&L, and Letter of Explanation again, previously sent. Diane Wardrup had already sent the documents he requested, her fax

1  confirmation time stamped **January 11, 2012, 3:40:12 PM CST,** for proof but
2  resent them again to ensure receipt.

3      56.   On January 11, 2012, Chase started the decline process without
4  talking to the homeowner Mr. McElfish or Diane Wardrup even though Diane
5  Wardrup was in constant contact and sent all the documents in a timely manner.

6      57.   On January 23, 2012, Ms. Wardrup again contacted William Leggitt
7  to follow up on the status of the file only to find out the file had been declined
8  due to lack of information when the fact of the matter is Diane Wardrup had
9  constant contact with William Leggitt and provided all information requested.

10      58.   On January 24, 2012, Diane Wardrup had an in depth conversation
11  with William Leggitt to try and understand why the file was declined. Please see
12  phone records for proof line 81. On January 25, 2012, Diane Wardrup contacted
13  Chase to see what the process was to re submit the file for modification. Please
14  see phone records for proof line 110-113.

15      59.   On January 27, 2012, Diane Wardrup faxed a new package in for
16  modification review. See fax confirmation time stamped **January 27, 2012**
17  **1:36:00 PM CST** for proof.  On February 16, 2012, Diane Wardrup called to
18  confirm Chase had received all documentation needed. Diane Wardrup was
19  informed that Mr. McElfish's income documentation needed to be resent in
20  again. Diane Wardrup faxed the updated income documents to Chase. Please
21  see fax time stamped **February 16, 2012 5:58:42 PM CST.**

22      60.   On February 21, 2012, Diane Wardrup called in and talked with Sal
23  Covarrubias, the new file handler for Chase who informed Diane Wardrup that
24  Chase again needed updated bank statements. Diane Wardrup informed Sal
25  Covarrubias she would collect these items from Mr. McElfish and would fax them
26  again.
27  ///
28  ///

COMPLAINT

61.   On February 22, 2012, Ms. Wardrup faxed over a new Request for Modification and Bank Statements over a year after the initial modification papers were filed in fax confirmation time stamped **January 27, 2012 1:36:00 PM CST.** On February 24, 2012, Ms. Wardrup contacted Chase to go over status of the file and to confirm receipt of fax. See phone log for proof 3:42 PM

62.   On February 27, 2012, Ms. Wardrup contacted Chase to go over status of the file See phone log for proof 10:21AM. On March 5, 2012, Ms. Wardrup contacted Chase to go over status of file.  On March 14, 2012, Chase Set foreclosure sale date for April 9, 2012 even though they stated many times previously that a sale date would not be set until a decision was made on the modification application.

63.   On March 16, 2012, Ms. Wardrup called Chase who advised Diane Wardrup of the foreclose sale date and that Chase needed the Request for Modification <u>sent again</u>. Diane Wardrup faxed in the RMA 2 times, fax time stamped **March 16, 2012 10:30:05 AM CDT** and **March 16, 2012 7:11:40 PM CDT.**

64.   On March 17, 2012, Diane Wardrup contacted Chase to confirm they received the Request for Modification Application.  Chase did get the RMA but requested that Diane Wardrup resend it for the 5th time. On March 19, 2012, Ms. Wardrup called but Chase asked her to send it again due to the date on it. On March 20, 2012, Diane Wardrup contacted Chase and Chase instructed Diane Wardrup to resend the RMA again as its legible "Pixilated" in the shaded areas of the form.  Diane Wardrup refaxed the RMA in 3 times, fax time stamped **March 20, 2012 12:29:00 PM CDT**, March 20, **2012 5:29:36 PM CDT and March 20, 2012 6:34:38 PM CDT**

65.   On March 20, 2012, Sal Covarrubias  informed Diane Wardrup he "Coded"  the for postponement. Also on March 20, 2012, Sal Covarrubias informed Diane Wardrup to resend the RMA and advised a foreclosure

1  postponement could not take place prior to 48 hours before the file is set to
2  foreclosure. On March 21, 2012, Diane Wardrup contacted Chase and Chase
3  informed Diane Wardrup that the RMA needed to be resent.  Diane Wardrup
4  refaxed the RMA, fax confirmation time stamped **March 21, 2012 10:38:32 AM**
5  **CDT.**

6      66.   On March 23, 2012, Diane Wardrup contacted Chase, Chase
7  confirmed all files were received and perfected.  On March 26, 2012, Diane
8  Wardrup contacted Chase and Chase confirmed the file was ready for
9  underwriting review, but this was not true either.

10     67.   During this entire modification process plaintiff was advised a "Sale
11 Date" would never be set if the file is actively being worked on for a modification.
12 Yet, plaintiff and his financial planner has been actively "working the file" to
13 obtain a modification, but a foreclosure sale date has been set for April 9, 2012.

14     68.   Defendant Chase's file handler, Sal Covarrubias, told the plaintiff and
15 his wife and his financial planner Ms. Wardrup on three (3) separate phone calls
16 that the file was "Coded for Postponement", when the fact is the file was not
17 coded as such and has still not been marked for postponement, even though the
18 sale date is a few business days away.

19     69.   Mr. Covarrubias informed plaintiff for the past 2 weeks that Chase
20 has everything that they need and the file will go to underwriting for a decision
21 on modification and a postponement of the sale date of April 9, 2012.  The file
22 still has not gone to underwriting as of the filing of this complaint.

23     70.   Plaintiff and his financial planner has escalated their efforts to get a
24 decision on this file for 4 days spending over 4 hours on the phone each day
25 trying to get someone to take ownership of the file, and no one has or will.  Every
26 escalation has lead plaintiff to the same conclusion, transferring him back to Mr.
27 Covarrubias, the person that has repeatedly mislead plaintiff many times.
28 / / /

**COMPLAINT**

71.   Mr. Covarrubias has instructed plaintiff that the sale date will not be postponed until 48 hours before the foreclosure date but not to worry because the file will be postponed.  He also stated that if the home were to foreclose, Chase would not honor the foreclosure sale as the file is actively being reviewed for a modification; yet neither he nor his supervisors will put anything of these representations or intentions in writing for plaintiff.

72.   Plaintiff was just informed on April 2, 2012 that a postponement will not take place unless the file is "under review and approved" for modification. The file will never be "under review and approved" if it continues to sit on Mr. Covarrubias's desk, where it has been for the past for months.

73.   Plaintiff has sent documents over and over to Chase only to have them inform him that they have never gotten the faxes even though the 3rd party fax company plaintiff uses has sent him fax confirmations of each fax.

74.   Plaintiff can provide phone records and fax confirmations of every call and fax sent to document the extent of work done on his end to give Chase everything they need to proceed and approve a modification for this home for the past year.

**E.    Chase Has Profited from Plaintiff's Misfortune, Compliance, and Desire to Keep Her House.**

75.   Mr. McElfish approached Chase for help as a responsible borrower who foresaw difficulty making future payments and with a desire to do the right thing. Knowing that Mr. McElfish has been desperately trying to keep his house, and having *instructed* him to stop making his mortgage payments so he would "move up on the list," Chase has fully leveraged its upper hand.

76.   It has been over a year since Mr. McElfish first applied for a modification to his home mortgage loan. Today he remains unsure whether or not he will be able to obtain a reasonable modification and keep his home.

1  Furthermore, despite the fact that Chase assured Mr. McElfish that his credit
2  would not be affected by any delinquency incurred in pursuit of a modification,
3  the opposite has happened, and his credit score has decreased substantially as
4  a result of Chase's misleading practices.

5      77.    Chase has continually failed to identify what information was
6  purportedly missing from Mr. McElfish's application materials for the past year.
7  Indeed, Mr. McElfish has no idea what information could have been be missing
8  from his application during the many months he has waited for a permanent
9  modification and repeatedly sent documentation to Chase. Rather, the "missing"
10 or "incomplete" document explanation appears to be a pretext for the denials
11 and delays in processing his application, which enabled Chase to collect scores
12 of documents, waste his time, subject him to unnecessary stress, and reap
13 thousands of dollars from him over the course of many frustrating months.

14     78.    Throughout this process, Chase has made a habit of sending Mr.
15 McElfish confusing and poorly explained documentation regarding his debt and
16 the fees Chase is charging. Mr. McElfish was typically told by Chase employees
17 to ignore these letters (which he did, as at that time he had no reason to believe
18 that Chase was misleading him), and no clear explanation of these fees was
19 ever given to him. On information and belief, Chase's representations that it
20 would not charge him any fees for a modification were false and misleading.
21 Moreover, Chase charged and collected fees that it was not entitled to collect
22 and/or that were unreasonable or excessive.

23     79.    Furthermore, Chase's assessment of Mr. McElfish's debt varied
24 wildly.

25     80.    Had Mr. McElfish known that the process for obtaining a modification
26 would have stretched past a year, he may have pursued other options, including
27 selling his house. Now, however, because he has poured thousands more
28 dollars into his home—even as his budget has tightened and because he has

had his credit score wrecked, his options are limited. He is at the complete mercy of Chase, who is profiting off of his misfortune.

81.    Mr. McElfish has not been given any explanation as to why he did not receive a permanent modification years ago.  Instead Chase has collected interest and fees from him unlawfully and in direct contravention of Chase's election to begin foreclosure proceedings by sending a default notice. Accordingly, fees collected by Chase as a result of its loan modification scheme were improperly collected.

82.    Had Mr. McElfish known that Chase did not intend to modify his loan, and would continue pursuing foreclosure, he would never have provided any other consideration in exchange for promises to modify his loan and forbear its foreclosure proceedings.

83.    Mr. McElfish's experiences illustrate painfully well Chase's pattern of deceptive, misleading, unfair, fraudulent, unlawful business practices that have been perpetrated by Chase. Chase has devised a fraudulent scheme to drag out the mortgage modification process to maximize its profits. This unlawful conduct preys on the most vulnerable homeowners in their time of greatest stress, anxiety and desperation. The chasm between Chase's authority to make loan modifications and "permanent workout solutions" succeed and mortgagors' paltry bargaining power couldn't be greater.

## VI.    CAUSES OF ACTION

84.    Plaintiff brings each of the following Causes of Action against Defendant Chase Home Finance LLC and Defendant JPMorgan Chase Bank, N.A. When greater details regarding the conduct of each Defendant become known, Plaintiff will amend this Complaint, as necessary.

/ / /

/ / /

COMPLAINT

# COUNT 1

## ("Unlawful" Business Practices in Violation of the Unfair Competition Law ("UCL") Bus. & Prof. Code §§ 17200, *et seq.)*

85.   Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

86.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

87.   A business act or practice is "unlawful" if it violates any established state or federal law.

88.   Defendants have violated, and continue to violate the "unlawful" prong of the UCL by breaching Chase's agreement with Fannie Mae of which the Plaintiff is the beneficiary.  Defendants further violate the unlawful prong of the UCL by violating the Rosenthal Fair Debt Collection Practices Act Cal. Civ. Code § 1788.2(c). Defendants have also breached direct contracts with Plaintiff and have breached their duties of good faith and fair dealing, as well as engaged in other common law violations (promissory estoppel and unjust enrichment). Defendants have engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

89.   Through their unlawful acts and practices, Defendants have collected, and continue to unfairly collect, excessive fees and charges from Plaintiff.   As such, Plaintiff requests that this Court cause Defendants to restore this money to Plaintiff, and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.  Plaintiff requests that this Court cause Chase to refund all excessive and unlawful fees or other charges assessed to Plaintiff in the course of its scheme.  Otherwise, Plaintiff may be irreparably harmed and/or denied an effective and complete remedy if such an

order is not granted.

## COUNT 2

### ("Unfair" Business Practices in Violation of the Unfair Competition Law ("UCL") Bus. & Prof. Code §§ 17200, *et seq.)*

90.   Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

91.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

92.   A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

93.   Defendants have and continue to violate the "unfair" prong of the UCL by inviting Plaintiff to participate in loan modification programs, refusing and failing to offer trial payments without the intention of permanently modifying their loans. Among other things, Chase Home Finance LLC and JPMorgan Chase Bank, N.A., have, in bad faith, failed to grant promised permanent loan modifications to plaintiff, a qualified applicant, following such applicants' compliant participation in temporary modification agreements; failed to take reasonable steps to work with eligible mortgagors to establish permanent modifications; misrepresented the status of loan modification applications; repeatedly requested duplicative financial information; erected artificial obstacles in the modification evaluation process to obstruct, delay, and/or prevent permanent loan modifications; failed to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed; failed to keep accurate records of applicants' scores on standard NPV tests; failed to provide account information requested by mortgagors; failed to provide adequate explanations of fees charged to mortgagors; charged

excessive, unlawful, and unreasonable fees; inexplicably and arbitrarily increased mortgagor debt obligations; caused improper interest and other fees to accrue; breached modification agreements, and unlawfully proceeded with foreclosures based on mortgagor's failure to meet impossible and shifting demands.

94.    The gravity of the harm to plaintiff resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Defendants for engaging in such deceptive acts and practices.

95.    By committing the acts and practices alleged above, Defendants have engaged, and continue to be engaged, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

96.    Through its unfair acts and practices, Defendants have obtained, and continue to unfairly obtain, excessive fees and interest from Plaintiff.  As such, Plaintiff requests that this Court cause Defendants to restore this money to Plaintiff and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.  Plaintiff requests that this Court cause Chase to refund all excessive and unlawful fees or other charges assessed to Plaintiff in the course of its scheme. Otherwise, Plaintiff may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

**COUNT 3**

**("Fraudulent" Business Practices in Violation of the Unfair Competition Law ("UCL") Bus.** & Prof. Code §§ **17200,** *et seq.)*

97.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

98.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

99. A business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public.

100. Defendants' acts and practices as described herein have deceived and/or are likely to deceive members of the public. Specifically, Defendants invited Plaintiff to participate in a loan modification program, promising that if Plaintiff complied with the terms of the modification programs, Chase would permanently modify his loan or make available an alternative "permanent workout solution," enabling him to avoid foreclosure.  Plaintiff relied on these representations in forgoing other options and instead entering a modification process and is now facing foreclosure without any decision on modification or the ability to short sell the home and avoid foreclosure.

101. As a result of the conduct described above, Chase has been, and will continue to be, unjustly enriched at the expense of Plaintiff.

102. Through its unfair acts and practices, Chase has improperly obtained, and continues to improperly obtain, money in terms of excessive interest, costs and fees from Plaintiff while delaying the modification decision while placing plaintiff in danger of foreclosure on April 9, 2012.  As such, Plaintiff requests that this Court cause Chase to permanently modify his loan terms pursuant to the HAMP guidelines and restore the fees and interests that has been charged to Plaintiff pursuant to this scheme, and to enjoin Defendants from continuing to violate the Unfair Competition Law as discussed herein.   Plaintiff requests that this Court cause Chase to refund all excessive and unlawful fees or other charges assessed to Plaintiff in the course of its scheme.  Otherwise, the Plaintiff may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

/ / /

/ / /

## COUNT 4

### (Unfair Debt Collection Practices Cal. Civ. Code §§ 1788, *et seq.)*

103. Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

104. Defendants are "debt collectors" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"). *See* Cal. Civ. Code §1788.2(c).

105. Defendants violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiff's mortgage debt, as alleged herein. *See* Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. §1692(e).

106. Plaintiff has suffered damages and harm as a result of Chase's unfair debt collection practices, including irreparable harm to their credit and the amounts charged in excessive fees and interest.

## COUNT 5

### (Breach of Contract / Breach of the Duty of Good Faith and Fair Dealing (Direct Contracts))

107. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108. By executing the Request for Modification applications, or other forms and returning them to Defendants, along with supporting documentation Plaintiff accepted Defendants' offer to modify the loan.

109. Alternatively, return of voluminous foreclosure information or other forms by Plaintiff to Defendants constitute valid offers. Acceptance of these offers occurred when Defendants accepted these forms from Plaintiff as specified in these documents.

110. The forms submitted by Plaintiff pursuant to Request for Modification application or other forms, constitute consideration. By signing

COMPLAINT

these forms, Plaintiff gave up the ability to pursue other means of saving their homes from foreclosure.

111.  The documentation of current income, legal representations about current personal circumstances, and other provision of requested information to Defendants by Plaintiff constitute consideration.   By undertaking these measures, Plaintiff spent valuable time and effort that could have otherwise been spent on other endeavors.

112.  Plaintiff thereby formed a valid contract with Defendants.

113.  To the extent that a contract with Plaintiff was subject to conditions subsequent, providing Defendants with the opportunity to review the documentation submitted by Plaintiff, this condition was waived by Defendants and/or Defendants are estopped from asserting it as a defense to Plaintiff's claims.

114.  Defendants routinely and regularly breach these contracts and/or their duties of good faith and fair dealing under these contracts by:

      A.    misrepresenting the requirements for achieving permanent modifications and the status of modification applications;

      B.    failing to offer Plaintiff permanent loan modifications, including but not limited to modifications under HAMP and other similar modification programs;

      C.    obtaining and accumulating excessive, fees, costs, and interest under TPPs or other temporary programs as a condition for promised permanent loan modifications, offers of the opportunity to obtain a "permanent workout solution," and/or promises of foreclosure forbearance, without any intention to permanently modify the loans, or any reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to implement

permanent loan modifications, provide a "permanent workout solution," or cease foreclosure activity;

D.   collecting unreasonable and/or inadequately disclosed fees, interest, or other charges;

E.   misrepresenting the terms of and the balances of the loans being serviced;

F.   pursuing foreclosure (either by initiating or continuing existing proceedings) against mortgagors without making a decision on a modification application that has been pending for over a year;

G.   failing to provide written notices required by HAMP;

H.   failing to provide explanations of fees assessed to mortgagors assessed under temporary modification programs;

I.   failing to retain, employ, and supervise adequately trained staff; and/or

J.   deliberately acting to delay, prolong, or otherwise frustrate the loan modification process, including but not limited to routinely demanding information already in Defendants' files, making inaccurate calculations and determinations of the eligibility of Plaintiff for loan modifications, and failing to follow through on written and implied promises.

K.   Plaintiff has demonstrated their willingness to perform under the contracts.

115. Plaintiff has suffered harm, including financial harm and psychological stress, and is threatened with additional harm as a direct and proximate result of Defendants' breaches.  By continuing to delay the Request for Modification under the modification programs, Plaintiff forgoes other remedies that might be pursued to save his home, such as restructuring his debt

under the bankruptcy code, or pursuing other strategies to deal with his defaults, such as selling or renting the home.

COUNT 6

(Breach of Contract / Breach of the Duty of Good Faith and Fair Dealing (Third Party Beneficiary Theory))

116. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

117. Chase's Servicer Participation Agreement ("SPA") for the Home Affordable Modification Program, as well as the explicitly incorporated HAMP program documentation, constitute a contract for which Plaintiff is intended beneficiary, and under which Chase has undertaken duties to act for the benefit of Plaintiff.

118. By entering into the SPA and accepting valuable consideration from the U.S. Treasury, Chase covenanted to administer its contractual obligations with principles of good faith and fair dealing.

119. Defendants have breached these contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting interests, costs and fees

120. Defendants routinely and regularly breach these contracts and/or their duties of good faith and fair dealing under these contracts by:

      A.    misrepresenting the requirements for achieving permanent modifications and the status of modification applications;

      B.    failing to offer Plaintiff permanent loan modifications, including but not limited to modifications under HAMP or other similar programs;

      C.    collecting and accumulating excessive costs, fees and interest under TPPs or other temporary programs as a condition for promised permanent loan modifications, offers of the

33

opportunity to obtain a "permanent workout solution," and/or promises of foreclosure forbearance, without any intention to permanently modify the loans, or any reasonable basis to believe that the loans would be permanently modified, and without taking diligent or reasonable steps to implement permanent loan modifications, provide a "permanent workout solution," or cease foreclosure activity;

D.   collecting unreasonable and/or inadequately disclosed fees, interest, or other charges;

E.   misrepresenting the terms of and the balances of the loans being serviced;

F.   pursuing foreclosure (either by initiating or continuing existing proceedings) against mortgagors without making a decision on a pending modification application;

G.   failing to provide written notices required by HAMP or other similar programs;

H.   failing to provide explanations of fees assessed to mortgagors assessed under temporary modification programs;

I.   failing to retain, employ, and supervise adequately trained staff; and/or

J.   deliberately acting to delay, prolong, or otherwise frustrate the loan modification process, including but not limited to routinely demanding information already in Defendants' files, making inaccurate calculations and determinations of the eligibility of Plaintiff for loan modifications, and failing to follow through on written and implied promises.

121.   Plaintiff has suffered harm, including financial harm and psychological stress, and is threatened with additional harm as a direct and

proximate result of Defendants' breaches.  By continuing to delay the Request for Modification under temporary modification programs and by continuing to submit paperwork that Chase continues to request with no intent to modify, Plaintiff forgoes other remedies that might be pursued to save his home, such as restructuring his debt under the bankruptcy code, or pursuing other strategies to deal with his default, such as selling or renting the home.

## COUNT 7

### (Promissory Estoppel)

122.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

123.  Defendants made representations to Plaintiff that if they performed under TPPs or other temporary modification program arrangements, including under HAMP, that they would receive a permanent loan modification.

124.  Defendants intended to induce Plaintiff to rely on these representations and stop making payments and to be delayed, continue submitting paperwork and financial documentation repeatedly without a decision on modification.

125.  Plaintiff did in fact reasonably rely on Defendants' representations, by stopping payments as directed as well as submitting documentation requested by Defendants.

126.  Reliance by Plaintiff was reasonable.

127.  Reliance by Plaintiff was to his detriment. Plaintiff has yet to receive permanent loan modifications, has lost opportunities to fund other strategies to deal with his default and avoid foreclosure, has faced financial burdens and psychological stress, and has given up valuable time and effort to meet Defendants' constantly shifting demands.

/ / /

## COUNT 8

### (Unjust Enrichment)

128. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

129. At all times relevant hereto, Defendants serviced residential mortgage loans in California.

130. Plaintiff conferred upon Defendants, without knowledge of the unlawful or deceptive pattern and practice in which Defendants were engaged, monies, including fees, interest, and other charges, benefits that were non-gratuitous. These benefits were beyond that to which Defendants are or were entitled. Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff even though Plaintiff was not receiving the quality of or fairness in mortgage loan servicing that had been represented by Defendants, or that reasonable mortgagors would have expected. Defendants induced Plaintiff to stop making mortgage payments and to continue negotiating for permanent modifications that Defendants had no intention of granting. Accordingly, Defendants made promises of permanent loan modifications that were illusory. Further, Defendants have prolonged modification processes to generate revenue for themselves, and delayed foreclosures until the time at which such action would produce optimum, or at least increased, profits to Defendants. Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiff under these circumstances is unjust and inequitable.

131. Accordingly, Plaintiff is entitled to, and hereby seeks, disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, in a manner established by the Court and available under applicable law.

/ / /

/ / /

/ / /

COMPLAINT

## COUNT 9

### PLAINTIFF SEEKS A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

132. A plaintiff seeking injunctive relief must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Toyo Tire Holdings of Ams. Inc. v. Continental Tire N Am., Inc., 609 F.3d 975 (9th Cir. 2010). A preliminary injunction should be granted if the foregoing factors are present. Elvis Presley Enterprises, Inc. v. Passport Video, 349 F.3d 622, 627 (9th Cir. 2003); Smartano v.First Judicial District Court, 303 F.3d 959, 965 (9th Cir. 2002).

### 1.    LIKELIHOOD OF SUCCESS ON THE MERITS.

133. The Ninth Circuit has a "sliding scale" in determining whether to grant injunctive relief. The more that Plaintiff can show the likelihood of irreparable injury, the less the Plaintiff has to show likelihood of success on the merits, and vice-versa. Alliance for the Wild Rockies v. Cattrell, 632 F.3d 1127 (9th Cir. 2011). Under the Ninth Circuit standard, if the party seeking relief raises "serious questions' going to the merits to make them a fair ground for litigation and the balance of hardships tips decidedly toward the requesting party, a likelihood on the merits has been established.

134. In this case, Plaintiff raises a prima facie case of unlawful/unfair business practices, unfair debt collection and fraud as alleged in the Complaint. Plaintiff has raised serious questions in his Complaint and Application for Temporary Restraining Order that Defendants misled Plaintiff throughout the loan modification process and delayed a decision on modifying the loan, with the purpose of foreclosing on the property, in violation of the laws set forth above. These facts raise serious questions that overwhelmingly indicate that the Plaintiff

is likely to prevail on the merits in this action.

## 2. LIKELIHOOD TO SUFFER IRREPARABLE HARM.

135. The determination of irreparable harm rests in the sound discretion of the trial court. California ex rel. Van de Kamp v. Tahoe Regional Planning Agency, 766 F.2d 1308, 1316 (9th Cir.1985). Irreparable harm has been defined as injury that cannot be compensated monetarily. Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995). The "likelihood of irreparable injury" requirement is satisfied by actual and irreparable injury. Alliance for the Wild Rockies v. Cattrell, 632 F.3d 1127 (9th Cir. 2011). Irreparable harm is often of a permanent nature or at least of long duration. It has been generally characterized as appreciable harm, i.e., considerable or substantial injury. Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez, 606 F.Supp.2d 1195, 1210, 1213 (E.D. Cal. 2008), citing Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 422 F.3d 782 (9th Cir.2005).

136. In this case, Plaintiff will suffer irreparable injury should Defendants be permitted to foreclose on the Subject Property.  All real property under the eye of the law is considered unique. Cal. Civ. Code §3387. Money cannot compensate for the loss of a family residence and home.

## 3. BALANCE OF EQUITIES.

137. This irreparable injury to the Plaintiff must be analyzed with the potential damage that could occur to Defendants if they were enjoined and restrained. The equities in this case are leveled against Plaintiff. Defendants will lose nothing if they are restrained from foreclosing on the Subject Property. Defendants will still be the mortgagors and could, pending the outcome of this action, regain possession of the Subject Property.  However, Plaintiff stands to lose a family residence and home if temporary relief is not granted.

### 4.   PUBLIC INTEREST

138. Protection of the public from fraudulent and deceptive lending practices is of the utmost public interest, especially after the economic crash of 2008 which was predicated, in part, on manipulative lending practices by lenders such as Defendants.   Defendants have continued to mislead the public, particularly Plaintiff, during the loan modification process.  Rather than honorably working towards a modification agreement, Defendants delay the process and arbitrarily set foreclosure dates, with the result being that no modification can be reached and properties are foreclosed on.   The prevention of Defendants' conduct is in the best interest of the public.

## VII.   PRAYER FOR RELIEF

139. WHEREFORE, Plaintiff, respectfully requests that this Court enter a judgment against Chase Home Finance LLC and JPMorgan Chase Bank, N.A. and in favor of Plaintiff, and grant the following relief:

A.   Enjoin Defendants from engaging in fraudulent, unlawful, or unfair business practices in the course of servicing residential mortgage loans;

B.   Enjoin Defendants from ignoring or failing to process loan modification applications and instead proceeding with non-modification procedures that are premised upon their deceptive, fraudulent, unlawful, misleading, or unfair business practices in the course of servicing residential mortgage loans;

C.   Declare the conduct of Defendants as alleged herein to be an unlawful violation of the UCL;

D.   Declare the conduct of Defendants as alleged herein to be an unlawful violation of the Rosenthal Act;

E.   Require Defendants to submit to outside audits and oversight,

**COMPLAINT**

paid for by Defendants, on a regular basis to ensure that their mortgage loan modification procedures are fair and reasonable, and that mortgagors receive adequate disclosures;

F.   Order Defendants to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties with respect to loan modifications, including under HAMP;

G.   Award damages to Plaintiff for all payments made pursuant to Defendants' unlawful practices, including unreasonable fees, interest, or other charges paid;

H.   Require Defendants to adjust the accounts of Plaintiff to eliminate any accrued fees, interest, or other charges that were unlawfully assessed and currently constitute debts owed by Plaintiff;

I.   Declare the acts and practices of Defendants described above to constitute breach of contract and a breach of the duty of good faith and fair dealing;

K.   Order specific performance of Defendants' contractual obligations to Plaintiff, together with other relief required under contract;

L.   Order specific performance of Chase's contractual obligations to the Federal National Mortgage Association ("Fannie Mae") under the SPA, for which Plaintiff is an intended beneficiary, together with other relief required under contract;

M.   Require Defendants to review and process all applications for residential loan modifications in a timely manner and without the delay and increased expense routinely imposed by Defendants on Plaintiff;

N.   Require Defendants to offer permanent modifications to P Plaintiff under contract or under the doctrine of promissory estoppel;

O.   Require Defendants to disgorge to Plaintiff all revenue earned as a result of their unlawful acts and practices and protracted loan modification negotiations;

P.   Award costs to Plaintiff for any fees or expenses incurred in wiring payments to Defendants under any temporary provisional modification plan or for any payments that were improperly rejected by Defendants;

Q.   Grant Plaintiff awards of actual, statutory, and/or compensatory, damages in such amount to be determined at trial and as provided by applicable law, to include but not be limited to payments made under "TPPs" or other temporary modification programs, as well as associated fees, interest, or other charges;

R.   Grant Plaintiff awards of punitive and/or exemplary damages as provided by applicable law, including due to Defendants' oppressive, fraudulent, and/or malicious conduct in servicing mortgage loans;

S.   Grant Plaintiff his costs of suit, including reasonable attorneys' fees, costs, and expenses as provided by law;

T.   Grant Plaintiff both pre-judgment and post-judgment interest as provided by law;

U.   Determine that Defendants are jointly and severally liable for the conduct alleged herein; and

V.   Grant Plaintiff such other, further, and different relief as the nature of the case may require or as may be determined to be

just, equitable, and proper by this Court.

## VIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 3, 2012

Respectfully submitted,

MCELFISH LAW FIRM


/s/ Raymond D. McElfish
Raymond D. McElfish, Esq.
Jose C. Massó IV, Esq.
Attorneys for Plaintiff, RAYMOND D. McELFISH

**COMPLAINT**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| RAYMOND D. McELFISH | CHASE HOME FINANCE LLC and JP MORGAN CHASE, N.A., |

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Raymond D. McElfish, Esq.; Jose C. Massó, Esq.
McElfish Law Firm - 1112 N. Sherbourne Drive, West Holywood, CA 90069
(310) 659-4900

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No   **☑ MONEY DEMANDED IN COMPLAINT: $** According to Proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Business + Professional Code 17200, 17888

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

*(In addition, TORTS - PERSONAL PROPERTY column lists: ☑ 370 Other Fraud)*

---

**FOR OFFICE USE ONLY:** Case Number: **CV12-2945**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | CHASE HOME FINANCE LLC - Delaware<br>JP MORGAN CHASE, N.A., - New York |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date April 3, 2012

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Michael Wilner.

The case number on all documents filed with the Court should read as follows:

## CV12- 2945 DSF (MRWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=============================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Raymond D. McElfish, Esq., SBN: 224390
Jose C. Massó IV, Esq., SBN: 256426
MCELFISH LAW FIRM
1112 N. Sherbourne Dr., West Hollywood, CA 90069
Telephone No.: (310) 659-4900

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| RAYMOND D. McELFISH, an individual, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | FOR OFFICE USE ONLY 2945 -DSF (MRW) |
| v. | |
| CHASE HOME FINANCE and JP MORGAN CHASE, N.A., | SUMMONS |
| DEFENDANT(S) | |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Raymond D. McElfish_____, whose address is _1112 N. Sherbourne Drive, West Hollywood, CA  90069_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __APR - 4 2012__

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                                          **SUMMONS**

APR - 4 2012